J-S30018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TERRENCE LOUIS SAUNDERS | : | |
| | : | |
| Appellant | : | No. 427 EDA 2025 |

Appeal from the Judgment of Sentence Entered January 15, 2025
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0006896-2023

BEFORE: OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY MURRAY, J.: **FILED SEPTEMBER 11, 2025**

Terrence Louis Saunders (Appellant) appeals from the judgment of

sentence imposed after a jury convicted him of one count of firearms not to

be carried without a license, and the trial court convicted him of one count of

persons not to possess firearms.[1] We affirm.

The trial court summarized the evidence adduced at trial:

On September 17, 2022, at approximately 7:30 a.m., Mariela
Amparo [(Ms. Amparo)] was employed by the Hyatt Hotel [in King
of Prussia, Pennsylvania (the hotel),] and worked [at] the front
desk. Appellant came into the hotel [and asked Ms. Amparo] for
a key to his room[, claiming] he locked himself out. Ms. Amparo
asked for his identification. Appellant gave her his driver's license,
which indicated that his name was Terrence Saunders. He was
not registered as a guest at the hotel. Ms. Amparo refused to give
[Appellant] any information. [Appellant] informed Ms. Amparo

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 6106(a)(1), 6105(a)(1).

that his wife, Tyra Saunders [(Ms. Saunders)], was cheating on him, was staying there, and he needed to get photographs for their divorce. [Appellant] attempted to look over the desk at [Ms. Amparo's] computer screen to see the information but was unable to do so. [Appellant] then left the front desk and went over to the breakfast area. At approximately 8:00 a.m., [Appellant] returned to Ms. Amparo at the front desk and again asked for information, but Ms. Amparo [again] refused to give him any [information]. Ms. Amparo testified that [Appellant] was wearing a long-sleeved black hoodie, high black pants, black hat, and glasses.

[Ms. Saunders testified she and Appellant separated in June 2021. In the days leading up to the date of the offenses,] Ms. Saunders believed Appellant was following her. On September 16, 2022, Ms. Saunders went to the [] hotel with Ode Scott [(Mr. Scott)], her significant other. That night, Ms. Saunders received a text from Appellant, which indicated that he knew she was at the hotel with someone. Ms. Saunders told Mr. Scott about the text messages, [and Mr. Scott] became upset.

On September 17, 2022, Ms. Saunders and Mr. Scott went to the parking lot of the hotel to check her car to see if there was a tracking device on it. While [they were] in front of her car, Appellant drove up, stopped, and got out of his car "[holding a] little stick-like object" …. Ms. Saunders testified that Appellant then turned around, went back and reached into his car[; whereupon Appellant] had a gun in his hand, and took a shot at Mr. Scott, who ran towards the hotel. Ms. Saunders heard one gunshot. Ms. Saunders testified that she heard Appellant say, "look what you made me do[,]" and [Appellant then] drove off. Ms. Saunders has a license to carry [a firearm] and[, at the time of the incident, she] had her gun unloaded in the locked glove compartment of her car … but did not take it out. Ms. Saunders testified that Mr. Scott also had a gun with him[,] but that [Mr. Scott] was not allowed to possess a gun. Ms. Saunders testified that Appellant was wearing black pants and a tank top shirt, but she did not remember the color of the shirt.

[Mr.] Scott testified that he and Ms. Saunders were in a romantic relationship [at the time of the offenses]. On September 17, 2022, Mr. Scott did not have a valid license to carry a firearm but possessed a loaded firearm at that time. That day, Mr. Scott had the firearm in a duffel bag that was in his car. … On September 16, 202[2], Mr. Scott met Ms. Saunders at the … hotel.

- 2 -

Mr. Scott was aware that Ms. Saunders received texts from Appellant, which indicated that he knew her whereabouts.

On September 17, 202[2], Mr. Scott had his gun in a holster in his waistband when he and Ms. Saunders went to the hotel's parking lot. Mr. Scott and Ms. Saunders were standing by her vehicle when Appellant, who was wearing a white t-shirt, got out of his car holding an "axe handle, a bat, or something, a stick." Mr. Scott testified that Appellant aggressively approached him, so [Mr. Scott] pulled out his firearm and aimed it towards the ground. At that time, Mr. Scott testified[,] … Appellant got back in his vehicle and pulled out a gun, perhaps from the center console, but Mr. Scott was unsure. Mr. Scott then began to run towards the hotel with his back turned when he heard a shot fired. Mr. Scott testified that he turned around to see Appellant fleeing in his vehicle. Subsequently, Mr. Scott placed his gun back into the duffel bag[,] and he and Ms. Saunders left the hotel. Mr. Scott testified that he never shot his gun during the confrontation with Appellant.

A portion of the incident was seen by an independent witness. On September 17, 2022, Clayton Steele [(Mr. Steele)] was staying with his family at the [hotel]. At approximately 11:12 a.m., Mr. Steele was in the parking lot when he saw two individuals, one male and one female, leave the rear of the hotel conversing very loudly, possibly arguing, with one another. Mr. Steele then saw them walk towards a vehicle that was [parked] three or four spaces from [Mr. Steele's car]. The male was tall and African American, and was wearing long sleeves, long pants, and a hat. Subsequently, another vehicle approached very quickly from the left past Mr. Steele's car and stopped very abruptly in front of the other vehicle. Mr. Steele saw the driver exit his vehicle and walk around the rear of the vehicle holding a black-colored handgun in his right hand. That individual was wearing a white tank top and shorts. Mr. Steele then heard the rack of the gun and a single gunshot. Mr. Steele went back inside the hotel and notified employees at the front desk. Police were then called.

Upper Merion Police Department responded to a report of shots fired at the [hotel]. Detective Danny Bocanumenth [(Detective Bocanumenth)] was part of the investigation into this matter. On September 18, 202[2], Detective Bocanumenth performed a secondary search of the [hotel parking lot] and found a .45-caliber shell casing. Detective Bocanumenth checked

whether Appellant had a valid license to conceal[ed] carry a firearm on his person or in his vehicle on September 17, 2022. [Appellant stipulated at trial that he] had no such valid license to carry on that date. [Appellant further stipulated that he was prohibited from possessing a firearm due to a 2004 conviction for aggravated assault.]

Trial Court Opinion, 4/22/25, at 2-4 (some capitalization modified; some paragraph breaks added; record citations omitted).

The Commonwealth subsequently charged Appellant with the above offenses, as well as four counts of recklessly endangering another person (REAP), and one count each of aggravated assault, stalking, and possession of an instrument of crime.[2] On August 27, 2024, following a simultaneous jury/bench trial, the trial court convicted Appellant of persons not to possess firearms; the jury convicted Appellant of firearms not to be carried without a license, and acquitted him of the remaining charges.[3]

On January 15, 2025, the trial court imposed a sentence of 4 to 8 years' imprisonment for persons not to possess firearms, and no further penalty for firearms not to be carried without a license. Appellant filed a timely post-sentence motion, which the trial court denied. Appellant timely appealed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises two issues for our review:

_____

[2] 18 Pa.C.S.A. §§ 2705, 2702(a)(1), 2709.1(a)(1), 907(a).

[3] The Commonwealth withdrew two of the four REAP charges before trial. The two remaining REAP charges identified Ms. Saunders and Mr. Scott as victims.

- 4 -

1. Whether [the verdicts were against] the weight of the evidence … [?]

2. Whether [the trial court abused its discretion by imposing a] sentence [that] did not follow the Sentencing Code [or] sentencing norms, and was manifestly unreasonable and excessive?

Appellant's Brief at 5 (issues reordered).

In his first issue, Appellant argues the verdicts were against the weight of the evidence. *See id.* at 31-34. Appellant asserts "there are many inconsistencies in the witnesses' testimony," maintaining Ms. Saunders and Mr. Scott gave contradictory testimony regarding the clothes Appellant wore at the time of incident and the "stick-like object" Appellant carried when he first exited his vehicle. *Id.* at 31-32. Appellant notes Ms. Saunders testified she did not know Mr. Scott was carrying a gun during the incident, whereas Mr. Scott testified "that he had had his gun in his hand when Appellant arrived at the hotel parking lot…." *Id.* at 32. Appellant argues "both Ms. Saunders and Mr. Scott had motive to lie," noting that "Ms. Saunders's romantic relationship with Appellant had not ended well," and that Mr. Scott faced criminal charges relating to his possession of a firearm during the incident. *Id.* Appellant further emphasizes that police never recovered the firearm Appellant allegedly possessed, and never matched the .45 caliber shell casing found in the hotel parking lot with any firearm. *Id.* Appellant maintains that "the evidence was so tenuous, vague, and uncertain that the verdict shocks the conscience of the court." *Id.*

The Commonwealth counters that Ms. Saunders, Mr. Scott, and Mr. Steele each testified that they saw Appellant holding a gun during the incident. Commonwealth Brief at 11. The Commonwealth also argues that the .45 caliber shell casing found at the scene could not have been fired from any gun owned by Ms. Saunders or Mr. Scott, as detectives testified that they confirmed Ms. Saunders's and Mr. Scott's guns were of a smaller caliber. *Id.* at 12-14. The Commonwealth maintains any inconsistencies in the witnesses' testimony were minor, and the fact finder was "free to resolve any contradictions in [the] testimony and consider any possible bias or motive to lie." *Id.* at 13.

> Our standard of review of a weight claim is well settled:
>
> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Williams*, 255 A.3d 565, 580 (Pa. Super. 2021) (citation omitted).

When a weight challenge "is predicated on the credibility of trial testimony, [appellate] review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." *Commonwealth v. Bowen*, 55 A.3d 1254, 1262 (Pa. Super. 2012); *see also Commonwealth v. Wright*, 314 A.3d 515, 524 (Pa. Super. 2024) ("[I]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court."). Conflicts in the evidence or contradictions in testimony are exclusively for the fact-finder to resolve. *Commonwealth v. Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012).

Further,

> [b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination [as to whether] the verdict is against the weight of the evidence.

*Id.*; *see also Commonwealth v. Sanchez*, 262 A.3d 1283, 1288 (Pa. Super. 2021) ("Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court."). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence."

***Commonwealth v. Weitzel***, 304 A.3d 1219, 1227 (Pa. Super. 2023)

(citation omitted).

Instantly, the trial court set forth the following analysis in its opinion:

[T]here is no dispute that the Appellant was present at the [h]otel on September 17, 2022. There is also no dispute that Appellant was trying to gain information as to which room his ex-wife, [Ms.] Saunders, was staying [in] with [Mr.] Scott. Lastly, there is no dispute that Appellant was in the parking lot with Ms. Saunders and Mr. Scott when the event occurred. Thus, the only issue is whether Appellant had a firearm on his person …. This court agrees that the testimony of Ms. Saunders and Mr. Scott was self-serving[,] and [the court] ultimately does not believe that it swayed the jury, as evidenced by the jury's not guilty verdict on the … aggravated assault charge. Rather, this court believes that … the only [un]biased and objective testimony at trial came from the independent fact witness, [Mr.] Steele.

Trial Court Opinion, 4/22/25, at 9.

After summarizing Mr. Steele's testimony, the trial court noted that

Mr. Steele testified that [the incident] happened quickly. While Mr. Steele apparently confused the color and type of clothes each man [(Appellant and Mr. Scott)] was wearing at the time of the incident, … such a minor inconsistency is not enough to reverse the jury's verdict in this case.[4] Mr. Steele unequivocally and uncontradictorily testified that the man with the gun stepped out of the car that approached very quickly from his left side and then stopped very abruptly in front of the individuals. Mr. Steele testified that man, who was driving the car, exited the vehicle and walked around the rear of the vehicle, holding a gun in his right hand. That man was Appellant.

***Id.*** at 10 (footnote added).

---

[4] Appellant's appellate argument on the weight issue fails to mention Mr. Steele's testimony, but rather focuses on inconsistencies in Ms. Saunders's and Mr. Scott's testimony. ***See*** Appellant's Brief at 31-32.

The trial court also noted detectives' testimony that the .45 caliber shell casing found at the scene could not have been fired from any gun owned by Ms. Saunders or Mr. Scott, as detectives confirmed Ms. Saunders's and Mr. Scott's guns were of a smaller caliber. *Id.* at 10 (citing N.T., 8/26/24, at 127-28, 131, 136, 143, 145-46, 148, 160). The trial court acknowledged that

> Appellant is correct that the firearm used to shoot [at] Mr. Scott was never recovered[,] nor was the shell casing that was found ever linked to a [particular] firearm. Additionally, this court agrees that there might have been minor inconsistencies in Mr. Steele's testimony, [but those inconsistencies were] not to such an extent that the jury's verdict should have been reversed. Based upon a totality of circumstances of direct and indirect evidence, the weight of the evidence presented by the Commonwealth served as a sufficient basis for the jury to make a credibility determination on this issue and to find Appellant guilty. As such, this court had no basis to overturn the credibility determination of the jury.

*Id.* at 10-11 (some capitalization modified). The trial court noted that, in convicting Appellant of persons not to possess firearms, the court "respect[ed] … the verdict of [the] jury" on the question of whether Appellant possessed a firearm during the incident. *Id.* at 11 (quoting N.T., 1/15/25, at 45). The trial court concluded that, "based upon the evidence presented and the arguments of counsel, the weight of the evidence supported" the verdicts. *Id.*

We agree with the trial court's analysis and conclusion. We discern no abuse of the trial court's discretion in its determination that the verdicts did not shock its conscience. Accordingly, Appellant's first issue merits no relief.

In his second issue, Appellant argues the trial court imposed a manifestly unreasonable and excessive sentence.

Preliminarily, we observe "[t]here is no automatic right of appeal from the discretionary aspects of a sentence." ***Commonwealth v. Glawinski***, 310 A.3d 321, 325 (Pa. Super. 2024) (citation omitted). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Id.*** (citation omitted). Here, Appellant filed a timely notice of appeal, preserved the issue in his post-sentence motion, and included the required Rule 2119(f) statement in his brief. ***See*** Appellant's Brief at 25-28.

We next consider whether Appellant presents a substantial question. "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Commonwealth v. McLendon***, 293 A.3d 658, 670 (Pa. Super. 2023) (quotation marks omitted). In determining whether a substantial question exists, we do not

> examine the merits of whether the sentence is actually excessive. Rather, we look to whether the appellant has forwarded a plausible argument that the sentence, when it is within the guideline ranges, is clearly unreasonable. Concomitantly, the

- 10 -

> substantial question determination does not require the court to decide the merits of whether the sentence is clearly unreasonable.

***Glawinski***, 310 A.3d at 325 (citation omitted).

Instantly, Appellant's Rule 2119(f) statement asserts the trial court imposed an excessive sentence and failed to consider mitigating factors. ***See*** Appellant's Brief at 28. This Court has held that "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question." ***Commonwealth v. Caldwell***, 117 A.3d 763, 770 (Pa. Super. 2015) (*en banc*) (citation omitted). We therefore conclude Appellant has raised a substantial question, and we will review the merits of his claim.

Appellant argues the trial court failed to adequately consider that Appellant's prior criminal record "was from an arrest 20 years ago," and "[s]ince that time," Appellant "had married, takes care of his three children, bought a house, and [maintained] steady employment." Appellant's Brief at 30. Appellant also argues that he was acquitted of aggravated assault, and was convicted only of possessory crimes. ***Id.*** Appellant maintains that, in light of these factors, the trial court imposed a sentence that was "manifestly excessive and unduly harsh." ***Id.***

The Commonwealth counters that the trial court properly considered each of the factors Appellant now raises. ***See*** Commonwealth Brief at 21-22. The Commonwealth emphasizes that **the trial court imposed a sentence within the mitigated range of the Sentencing Guidelines**. ***Id.*** at 20-21;

*see also id.* (arguing the standard range called for a minimum sentence between 4½ and 6 years).

The standard of review we observe "when reviewing the discretionary aspects of sentencing is very narrow." *Commonwealth v. King*, 182 A.3d 449, 454 (Pa. Super. 2018) (citation omitted).

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias, or ill will, or arrived [at] a manifestly unreasonable decision.

*Commonwealth v. Torres*, 303 A.3d 1058, 1065 (Pa. Super. 2023) (citation omitted).

"In every case in which the court imposes a sentence for a felony … the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed." 42 Pa.C.S.A. § 9721(b). The Sentencing Code requires the trial court to

> follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

*Id.*; *see also Commonwealth v. McClendon*, 589 A.2d 706, 712 (Pa. Super. 1991) (*en banc*) (stating "the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for

rehabilitation." (internal citations and quotation marks omitted)).  The trial

court must also consider the Sentencing Guidelines.  42 Pa.C.S.A. § 9721(b);

*see also Commonwealth v. Sheller*, 961 A.2d 187, 190 (Pa. Super. 2008)

("When imposing a sentence, the sentencing court is required to consider the

sentence ranges set forth in the Sentencing Guidelines….").

> Additionally,
>
> [w]here the sentencing court had the benefit of a presentence
> investigation report ("PSI"), we can assume the sentencing court
> "was aware of relevant information regarding the defendant's
> character and weighed those considerations along with mitigating
> statutory factors." *Commonwealth v. Devers*, 546 A.2d 12, 18
> (Pa. 1988); *see also Commonwealth v. Tirado*, 870 A.2d 362,
> 368 (Pa. Super. 2005) (stating if sentencing court has benefit of
> PSI, law expects court was aware of relevant information
> regarding defendant's character and weighed those considerations
> along with any mitigating factors).  Further, where a sentence is
> within the standard range of the guidelines, Pennsylvania law
> views the sentence as appropriate under the Sentencing Code.
> *See Commonwealth v. Cruz-Centeno*, 668 A.2d 536 (Pa.
> Super. 1995) (stating combination of PSI and standard range
> sentence, absent more, cannot be considered excessive or
> unreasonable).

*Commonwealth v. Moury*, 992 A.2d 162, 171 (Pa. Super. 2010) (citations

modified).

Instantly, in its opinion, the trial court thoroughly detailed the factors

informing its sentencing decision:

> Appellant acknowledged that he was sentenced in the mitigated
> range of the [Sentencing Guidelines,] but alleged that [the] court
> failed to take into account that [Appellant] had been crime[-]free
> for over twenty years prior to this incident[;] the circumstances
> leading to his arrest [arose from] his ex-wife … cheating and
> [were] therefore unlikely to be repeated[; Appellant] had been
> gainfully employed for the past sixteen … years and that

- 13 -

employment was available to him upon his release[;] and [Appellant] has been and continues to be rehabilitated…. Furthermore, Appellant alleged that the penalty was purely punitive in nature. To the contrary, the court [considered] all of the aforementioned factors in reaching its sentence. In fact, the court stated as follows [during the sentencing hearing]:

I know that [Appellant] committed a crime back in 2000. And I understand that people change. And I understand that [Appellant] has changed. And I understand that [Appellant] has turned his life around since his incarceration. There is no evidence of any criminal activity between the end of his incarceration and the date of his arrest in this case. That shows me a number of things. It shows me that [Appellant] worked hard to become a productive citizen. That is further evidence[d] by his work history and his family history. I commend [Appellant] for being able to do that. It is not easy. I respect [Appellant's] efforts to become the father that he needed to become, the husband that we heard of, the employee that we have learned he has become. All of those things are extremely impressive and impress me as I sit here in judgment of sentence.

N.T., 1/15/25, at 46. Nonetheless, the court disagreed with some of the testimony[,] in that it could not be said that Appellant was a "total good role model." *Id.* at 47. Specifically, the court stated[, "T]ake away the gun, [and] this event is not something that a positive role model would have done. Add to it a gun, and it becomes something that is the opposite of what we should be teaching those who look up to us." *Id.* Along those same lines, the court noted how important the law is that … prohibits certain individuals from carrying firearms. "Shots were fired. Without a gun, there can't be a shot." *Id.* …

[The trial court] took the following into account when sentencing Appellant:

[The court considered] the pleas of [Appellant's] family with regard to their inability to function as they have functioned without [Appellant's] contributions, the fact that his conviction that precludes him from owning a firearm is old, and [the court] was willing[,] based on [Appellant's] good conduct[,] to sentence him within the mitigated range. That being said, the thought of deviating beyond that is not

- 14 -

something that I can accept. I do not believe house arrest is a suitable punishment for this type of offense in this set of circumstances. [Appellant] was precluded from possessing a gun. And he possesse[d] a gun. And the result of that was a chaotic situation where the results could have been far worse. I sentence him on the basis of the facts that occurred, not what could have happened.

*Id.* at 48-49. Furthermore, the court took into consideration all of the testimony that it heard, all that is contained in the trial and sentencing memoranda, the notes of testimony of the trial, the sentencing guidelines, the [PSI] as amended, the arguments of counsel, and the allocution of Appellant in fashioning its sentence. *See id.* at 49.

Trial Court Opinion, 4/22/25, at 14-16 (some capitalization and record citations modified; footnote added).

Our review of the record confirms the trial court had the benefit of a PSI and considered all relevant sentencing factors in fashioning Appellant's sentence, including each of the mitigating factors Appellant highlights on appeal. We discern no abuse of the trial court's sentencing discretion in imposing this mitigated-range sentence. Accordingly, Appellant's second issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/11/2025

- 15 -